IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Southern Division
Civil Action No. 7:21-cv-85

| | |
|---|---|
| GEORGE COLE,<br><br>  Plaintiff,<br><br>v.<br><br>COASTAL CAROLINA COMMUNITY COLLEGE; DAVID HEATHERLY, in his official capacity; GINGER TUTON, in her official capacity; SHARON MCGINNIS, in her official capacity; and ANNETTE HARPINE, in her official capacity,<br><br>  Defendants, | **COMPLAINT** |

Plaintiff George Cole, by and through counsel, complains of Defendants as follows:

1. This is an action brought under 42 U.S.C. § 1983 seeking damages for Defendants' violation of Mr. Cole's rights to free speech and free expression under Article I of the United States Constitution.

2. Mr. Cole is an award-winning artist who has studied at Coastal Carolina Community College ("CCCC") for close to two decades in multiple subject areas. A former student in the art department at CCCC, Mr. Cole's works have received critical acclaim from his colleagues, instructors, and the larger art community in the area.

3.     Like much great art, Mr. Cole's works often comment on contemporary social and religious issues, sometimes in a provocative manner meant to create critical reflection and discussion among viewers.  By tackling difficult and controversial subjects, Mr. Cole's artwork has inevitably upset some members of the community, who have complained about Mr. Cole's works at previous art shows. Because of these previous complaints, administrators at CCCC chose to ban Mr. Cole's artwork from the school's student exhibition in 2018 and 2020.  This decision was not based upon the artistic quality and merit of Mr. Cole's works, but was instead based on the administration's fears that the works would once again cause controversy on campus and in the community, particularly among large local donors to CCCC.  By removing Mr. Cole's works to avoid controversy, CCCC and its administrators engaged in textbook viewpoint discrimination in violation of Mr. Cole's First Amendment rights.

## Parties and Jurisdiction

4.     Mr. Cole is a citizen and resident of Onslow County, North Carolina.

5.     Defendant CCCC is a community college organized under Chapter 115D of the North Carolina General Statutes, the campus of which is located in Onslow County, North Carolina.

6.     Defendant David Heatherly is a citizen and resident of Onslow County, North Carolina.

7.     Defendant Ginger Tuton is a citizen and resident of Onslow County, North Carolina.

Case 7:21-cv-00085-BO   Document 1   Filed 05/07/21   Page 2 of 21

8.     Defendant Sharon McGinnis is a citizen and resident of Onslow County, North Carolina.

9.     Defendant Annette Harpine is a citizen and resident of Carteret County, North Carolina.

10.     Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.

11.     The Court has subject matter jurisdiction over this action.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021).

12.     Venue is proper under 28 U.S.C. § 1391.

## Mr. Cole's Background at CCCC

13.     Mr. Cole's artistic work is heavily influenced and shaped by his life experiences.  Specifically, the tragic death of his teenage daughter in 2002 inspired him to pursue art more seriously and take up formal study at CCCC.  Art became a solace to Mr. Cole through this dark period of his life.  Through art, Mr. Cole found an outlet and release to overcome his grief.

14.     In 2002, Mr. Cole enrolled at CCCC, and his courses in the art department proved to be inspirational.  His experience there sparked a curiosity and life-long devotion to learning and study that have carried forward to this day.  Mr. Cole ultimately not only pursued art at CCCC, he enrolled in other subjects as well. During his time at CCCC, Mr. Cole has learned the expressive power of art and how to convey meaning and ideas in a variety of media.

15.     Art has also continued to provide an emotional fallback for Mr. Cole through other difficult periods of his life, including the death of his mother to cancer.

3

Throughout his life, Mr. Cole has turned to art as a creative outlet and way in which to express his thoughts and feelings on a wide variety of subjects.

16.     As a Christian, Mr. Cole's works often feature religious themes and iconography; they consider many of the fundamental tenets of Christianity through a modern perspective.

17.     Throughout his time at CCCC, Mr. Cole's instructors have consistently praised the thoughtfulness and quality of his work, as well as his creativity and attention to detail. He has often been praised for going above and beyond what is expected in a typical assignment and challenging himself and the viewer in his artistic endeavors. Mr. Cole's instructors have also noted his professional demeanor, recommending him for professional work in the community.

18.     Throughout his time at CCCC, Mr. Cole has also become known in the regional art community, having works displayed and winning local contests and awards.

### Mr. Cole Creates Community Backlash in Response to the 2009 Student Art Exhibitions

19.     Mr. Cole first drew the ire of CCCC administrators over a decade ago, after he entered a painting titled *Smoking Jesus* in the 2009 Student Art Exhibition.

20.     The work depicts the reclining figure of Jesus Christ, with the wounds from his crucifixion visible, leaning on one arm and holding a cigarette in the other hand. Underneath the painting sits a large stone with the inscription "Let him who is without sin cast the first stone." A true and accurate photograph of the work is attached hereto as Exhibit A.

4

21.     With this work, Mr. Cole sought to comment on the demonization of smoking by members of the Christian community, particularly in light of the teachings and admonitions of Jesus.

22.     *Smoking Jesus* received critical acclaim at the exhibition, winning Best in Show.  At the time, Mr. Cole received no indication that administrators had reacted negatively or would react negatively to his work.  Indeed, Mr. Cole received congratulations from faculty and administrators who attended the exhibition, including Linda Douglas the Division Chair for Humanities and Fine Arts at CCCC.

23.     Mr. Cole's painting also attained notoriety in the local newspaper, *The Jacksonville Daily News*, where a photograph of the work accompanied an article about the exhibition.

24.     After seeing the painting in the paper, some members of the local community expressed a negative reaction to the work.  Apparently not understanding the context or Mr. Cole's intent, some members of the community were offended, believing the painting to be sacrilegious and blasphemous.

25.     In response to those in the community who expressed unfavorable views of the painting, Ronald K. Lingle, president of CCCC, prepared a memorandum to the Board of Trustees, detailing the negative reactions from community members in light of the *Daily News* photograph and outlining a process to select works for the student art exhibit going forward to avoid "public controversy."

26.     Despite administrators, including Ms. Douglas, attending the exhibition, the administration claimed that they first learned about *Smoking Jesus* being awarded Best in Show in the *Daily News* article.

27.     In his memorandum, President Lingle acknowledged and admitted that students had a right to free expression and that the college could not prevent Mr. Cole from creating his artwork or entering it into the annual Student Art Exhibition. However, the memorandum called for the creation of a committee of administrators and faculty to award Best in Show going forward, made up of members who would work to keep controversial works from appearing as though they had the support and approval of CCCC. The memorandum also demanded that faculty check with the administration before submitting anything to the local newspaper in the future.

28.     After the 2009 Student Art Exhibition, *Smoking Jesus* was banned from further viewing at CCCC. Mr. Cole was forbidden from displaying *Smoking Jesus* on campus, despite it winning Best in Show at the exhibit. Additionally, Mr. Cole was not allowed to use *Smoking Jesus* as part of the promotional material used to generate interest in art clubs and the art department among students on campus.

29.     Upon information and belief, the administration changed its policy on the student art exhibit as a direct result of Mr. Cole's artwork in the 2009 Student Art Exhibition. This policy change was purposefully designed to silence Mr. Cole and other students who would present challenging and controversial works at the student art exhibition or explore religious themes.

30.    Upon information and belief, a variation of this administrative review process begun in 2009 would be used to censor Mr. Cole's works and keep them from being a part of the Student Art Exhibition in 2020.

## Mr. Cole's Artwork Continues to Generate
## Public Reaction at Later CCCC Art Exhibitions

31.    Despite *Smoking Jesus* causing some controversy in the local community, administrators at CCCC at first did not outright ban Mr. Cole's works from the annual Student Art Exhibition.

32.    Mr. Cole's works continued to receive high praise by the exhibition judges, for instance winning first prize at the Student Art Exhibition again in 2012. But those particular pieces did not contain religious elements or imagery.

33.    Nevertheless, some members in the community continued to find Mr. Cole's works offensive and disparage them to administrators at CCCC.  For instance, in 2012, CCCC again received complaints about Mr. Cole's works from local community members who had attended the exhibition.  These members complained that the works were obscene and pornographic, calling them "filth" and demanding that Mr. Cole be banned from entering further works in the exhibition.

34.    The attention Mr. Cole's work received from CCCC administrators regarding its religious content affected Mr. Cole in the larger artistic community. Upon information and belief, based on the college's reaction to Mr. Cole's works and the statements made by CCCC administrators, Mr. Cole's reputation in the larger regional art community was harmed.

35.     Specifically, Mr. Cole was not allowed to display his works in certain art shows in the local area based on the reputational harm he suffered because of the CCCC administration's reaction to his work.

36.     Upon information and belief, CCCC administrators feared angering members of the local community, particularly donors who they believed might cease to support the college.

37.     Upon information and belief, CCCC administrators did not want controversial works, particularly works religious in nature, to be a part of the student art exhibition.

38.     Upon information and belief, in an effort to assuage these donors, administrators created a policy that infringed on Mr. Cole's First Amendment right to free speech.

### CCCC Administrators Ban Mr. Cole's
### Works from the 2020 Student Art Exhibition

39.     In 2018, while enrolled again at CCCC in the auto mechanics program, Mr. Cole, who continued to produce artwork, sought to participate in the annual Student Art Exhibition again. That year, Mr. Cole created two works, titled *Jesus First Bike* and *The Hero* respectively, for entry in the annual Student Art Exhibition. Unfortunately, Mr. Cole was told that he would not be allowed to enter works that depicted religious content or themes. Neither work was accepted for the exhibition, even though both works would have qualified but for the fact that they depicted religious content and themes.

8

40. After continuing to work on *Jesus First Bike* and *The Hero*, Mr. Cole once again sought to enter them in the 26th Annual Student Art Exhibition, scheduled to run between March 26 and April 12, 2020 (the "2020 Exhibition").

41. An advertisement for the 2020 Exhibition announced that works from all media would be accepted for jury selection. The jury selecting the works for the 2020 Exhibition would consist of current CCCC students.

42. No thematic or subject matter criteria or limitation was set for submissions to the 2020 Exhibition.

43. *Before* students could submit their works to the student jury for artistic evaluation, however, they first had to submit their works through a new online administrative review process.

44. Although now online, this review process was substantially similar to the process outlined in Dr. Lingle's 2009 memorandum to the Board of Trustees. Students were required to upload digital images of their proposed works via a link to dropbox.com *before* submission to the student jury. After students uploaded images of their proposed submissions, a committee made up of four senior CCCC administrators—President David Heatherly, Vice President Ginger Tuton, Vice President Sharon McGinnis, and Vice President Annette Harpin (each a Defendant; collectively, the "Administrative Review Committee")—evaluated each student's artwork.

45. In addition to photographs, students were required to submit information about their artwork to the Administrative Review Committee for review,

including a description of the work and the price at which they wished to sell the work at the 2020 Exhibition.

46. Students who did not submit works via the administrative review process were not allowed to submit their works to the student jury for the 2020 Exhibition. Likewise, images submitted via dropbox.com that did not capture the work with sufficient detail in the minds of the administrators faced rejection by the Administrative Review Committee.

47. If the Administrative Review Committee rejected a student's work during the administration review process, the student jury would not consider the work for any prizes awarded at the 2020 Exhibition, and the work would not be eligible for display or sale.

48. Upon information and belief, none of the members of the Administrative Review Committee is a faculty member of the art department at CCCC, and no faculty members of the art department participated in the administrative review process.

49. Upon information and belief, the Administrative Review Committee sought to censor works submitted by students—Mr. Cole in particular—to avoid creating controversies surrounding his artwork as had previously occurred.

50. Mr. Cole timely submitted *Jesus First Bike* and *The Hero* for the 2020 Exhibition, by uploading digital images of them to the required dropbox.com site to undergo administrative review. A photograph of each of the works is attached hereto as Exhibits B and C respectfully.

10

51.     On March 9, 2020, Mr. Cole received an email from Anthony James, Chair of the Division of Humanities and Fine Arts, informing him that he would need to submit additional digital images of his work to the dropbox.com link as part of the administrative review process.

52.     Mr. Cole willingly complied with this request and submitted additional photographs of each work the next day.

53.     On March 11, 2020, Mr. Cole saw Mr. Kevin Mertins, an instructor in the art department, in the CCCC cafeteria.  During his ensuing conversation with Mr. Mertins, Mr. Cole learned for the first time from Mr. Mertins that the Administrative Review Committee had screened his works and would not allow *Jesus First Bike* or *The Hero* in the 2020 Exhibition.

54.     The next morning, Mr. Cole received an email from Ms. Andrea Van Engelenhoven, another instructor in the art department, giving official notice from CCCC that Mr. Cole's works had been "administratively removed" from consideration for the 2020 Exhibition.  Ms. Van Engelenhoven provided no explanation for the Administrative Review Committee's decision or reasoning for removing Mr. Cole's submissions.

55.     In response to the news that the Administrative Review Committee had banned his works from the 2020 Exhibition, Mr. Cole immediately contacted Mr. James to request reevaluation of the works or, barring that, an explanation as to why the Administrative Review Committee had rejected his submissions, including any grounds set forth in the student policy handbook.

11

56.     Mr. James failed to provide any explanation as to why the Administrative Review Committee had removed Mr. Cole's works from consideration in the 2020 Exhibition.

57.     Upon information and belief, Mr. Cole's works were banned because his previous submissions had generated controversy in the community in response to Mr. Cole's treatment of religious images and themes.

58.     Upon information and belief, the Administrative Review Committee rejected Mr. Cole's works based on the viewpoint those works express or represent.

### Mr. Cole's Attempts to Get Answers are Stonewalled by the CCCC Administration

59.     Despite Mr. Cole's repeated attempts to get answers to his questions, Mr. James provided no updates.  For instance, on March 23, 2020, in response to Mr. Cole's request for information, Mr. James instead responded that faculty members were shifting their focuses to online instruction in the face of the pending changes brought on by the novel coronavirus.  Mr. James stated that these changes would cause him some delays in responding to Mr. Cole, but that he hoped to follow up with additional information at a later date.

60.     Mr. James did not follow up with Mr. Cole and ignored Mr. Cole's requests for updates.

61.     On May 25, Ms. Tuton, Vice President of Instruction, wrote the following terse response to Mr. Cole's inquiry into the Administrative Review Committee's reasoning, stating, "The decision to exclude certain works on occasion, including yours in this case, will stand."  Ms. Tuton failed to acknowledge whether the

Administrative Review Committee had reconsidered Mr. Cole's works. Moreover, despite being a member of the Administrative Review Committee herself, Ms. Tuton offered no explanation as to why the committee had banned Mr. Cole's works from the 2020 Exhibition.

62.     Over the summer of 2020, Mr. Cole petitioned for his student records in an attempt to find out more information about the decision to ban his artwork at the 2020 Exhibition.

63.     As part of his records produced, Mr. Cole discovered Dr. Lingle's 2009 memorandum to the Board of Trustees, creating an administrative review committee for all artwork entered into the Student Art Exhibition.

64.     Based on the information learned through his student records request, on October 6, 2020, Mr. Cole sought through a North Carolina public records request, *inter alia*, more information about the details outlined in Dr. Lingle's 2009 memorandum and copies of the correspondences between CCCC administrators and the community members that were offended by Mr. Cole's artwork. Mr. Cole also sought records with respect to the Administrative Review Committee's decision to ban his works from the 2020 Exhibition.

65.     Additionally, in the fall of 2020, Mr. Cole initiated a formal grievance process pursuant to the CCCC student policy handbook. On September 21 2020, Mr. Cole contacted Matthew Herrmann, Division Chair for Student Services, to file a formal complaint concerning the 2020 Exhibition and the lack of response by the CCCC administration regarding the administrative removal of Mr. Cole's works.

66.     Incredibly, Mr. Herrmann's initial response to Mr. Cole was that it was too late to initiate the grievance process because an initial meeting with faculty or staff did not occur within five days, as required by the student handbook policy. Mr. Herrmann failed to explain how this process could have occurred in light of the school closure due to the Covid-19 shutdown or in light of the fact that Mr. Cole's previous inquiries regarding the 2020 Exhibition had been completely ignored by the administration at CCCC.

67.     Mr. Cole was finally able to meet with the faculty of the art department in charge of the 2020 Exhibition and begin the grievance process on October 15, 2020. The art faculty explained to Mr. Cole that they played no part in the process of rejecting his works for the 2020 Exhibition. Instead, the faculty members once again explained that the Administrative Review Committee alone had made the decision and had administratively removed his works.

68.     Because they had played no part in the decision to ban Mr. Cole's works, Mr. Cole was unable to resolve his grievance by meeting with the art faculty in charge of the 2020 Exhibition. Accordingly, Mr. Cole next contacted Mr. James to schedule a meeting pursuant to next step in the process outlined by the student policy guidelines.

69.     On or about October 19, 2020, Mr. Cole met with Mr. James at CCCC to discuss his grievance. After this meeting, Mr. Cole had no other formal contact with the administration of CCCC.

70.     Additionally, on October 16, 2020, Mr. Cole also received a response from Mr. Herrmann regarding his inquiry into the membership of the Administrative Review Committee.  Upon learning that the members of the Administrative Review Committee were the senior administrators who would also be reviewing his grievance petition, Mr. Cole inquired whether those members would recuse themselves to ensure a fair hearing on his complaint.

71.     In response to his inquiry, Mr. Herrmann informed Mr. Cole that there was no procedure to review or appeal a decision made by senior administrators, such as the Administrative Review Committee.  The effective result of this communication was to inform Mr. Cole that he would not receive a hearing on his grievance.  As a result, no hearing has taken place, and no hearing will take place.

72.     Mr. Herrmann suggested that Mr. Cole speak with the college's attorney, Mr. Deke Owens, regarding his grievance.  Despite repeated attempts to discuss the issue with Mr. Owens, Mr. Cole received no response from him.

73.     Upon information and belief, members of the CCCC administration, including members of the Administrative Review Committee, violated the college's internal policy for resolving grievances by refusing to communicate with Mr. Cole and refused to afford him a fair hearing on his complaint.

74.     Upon information and belief, members of the Administrative Review Committee refused to recuse themselves from the grievance process, which would have ensured that Mr. Cole received a fair review of their decision to "administratively remove" his works from the 2020 Exhibition.

75.    Upon information and belief, members of the Administrative Review Committee instructed faculty members to delay meeting with Mr. Cole in order to stop him from using the college's grievance process to vindicate his First Amendment rights.

76.    Upon information and belief, members of the administration sought to delay Mr. Cole so that he might graduate, leave the college, or otherwise give up and no longer pursue his complaint through the college's grievance process.

77.    Upon information and belief, CCCC administrators intentionally ignored Mr. Cole's requests for information in the hopes that he would cease pursuing the vindication of his Constitutional Rights.

78.    In short, though it is not required to bring this claim, Mr. Cole has exhausted the administrative grievance process.    No additional administrative appeal or process is available, and, in any case, it would be futile.

## FIRST CLAIM FOR RELIEF
### (Freedom of Speech—First Amendment)

79.    The previous paragraphs are incorporated by reference as if fully stated herein.

80.    Due to the aforementioned restrictions, including the policy adopted by the College allowing administrators to remove Mr. Cole's works from the Student Art Show, Defendants have deprived Mr. Cole of his right to engage in protected speech in violation of the Free Speech Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

16

81.    Defendants' restriction on Mr. Cole's speech is content and viewpoint based in violation of the Free Speech Clause of the First Amendment.  Defendants' true purpose for administratively removing Mr. Cole's works was to silence the viewpoint expressed by Mr. Cole, which Defendants believed could cause controversy and negative reactions from others in the community.  Consequently, the true purpose for adopting the resolution was to silence disfavored viewpoints in violation of the Free Speech Clause of the First Amendment.

82.    Defendants' violation of Mr. Cole's Constitutional rights was complete at the point in which they refused to allow him to enter his paintings in the 2020 Student Art Exhibitions based on the viewpoint of their content.

83.     As a direct and proximate result of Defendants' violation of the Free Speech Clause of the First Amendment, Mr. Cole has suffered the loss of his constitutional rights, entitling him to, at least, nominal damages.

84.    As a direct and proximate result of Defendants' violation the Free Speech Clause of the First Amendment, Mr. Cole has suffered additional damages in the form of lost opportunities to sell his works at the 2020 Exhibit, as well as financial and reputational harm in the local artistic community, which has led to other lost opportunities to show and sell his artwork.

## SECOND CLAIM FOR RELIEF
### (Establishment Clause – First Amendment)

85.    The previous allegations are incorporated by reference as if fully stated herein.

86.    Due to the aforementioned restrictions, including the policy adopted by the College allowing administrators to remove Mr. Cole's works from the Student Art Show, Defendants violated and continue to violate the Free Exercise Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

87.    Defendants' policy with respect to the 2020 Exhibition was designed to exclude Mr. Cole's works from the 2020 Exhibition because of their religious content, message, and imagery.  By creating a policy allowing administrators to decide what religious works constitute sacrilege and blasphemy and remove Mr. Cole's religious-themed works reflecting his Christian beliefs, Defendants violated and continue to violate the Establishment Clause of the First Amendment by entangling themselves in ecclesiastical matters and curtailing Mr. Cole's right to religious expression through his artwork.

88.    Defendants' violation of Mr. Cole's Constitutional rights is ongoing because they refused to allow him to enter his paintings in the 2020 Student Art Exhibitions based upon their religious nature and continue to refuse to correct the wrong, despite his multiple attempts to bring the issue to a resolution using CCCC's student grievance process.

89.    As a direct and proximate result of Defendants' violation of the Establishment Clause of the First Amendment, Mr. Cole has suffered the loss of his constitutional rights, entitling him to, at least, nominal damages.

90.     As a direct and proximate result of Defendants' violation the Establishment Clause of the First Amendment, Mr. Cole has suffered additional damages in the form of lost opportunities to sell his works at the 2020 Exhibit, as well as reputational harm in the local artistic community, which has led to other lost opportunities to show and sell his artwork.

## THIRD CLAIM FOR RELIEF
### (Permanent Injunction)

91.     The previous paragraphs are incorporated by reference as if fully stated herein.

92.     If a permanent injunction is not issued, Defendants are likely to continue to engage in their practice to violate the First Amendment by engaging in viewpoint discrimination designed to censor controversial expression at CCCC.

93.     As alleged above, Defendants' continued viewpoint discrimination has caused irreparable damage to Mr. Cole in a manner that cannot sufficiently be redressed with monetary relief alone.

94.     The balance in hardships weighs against Defendants and in favor of an injunction, as the equities favor freedom of speech and expression, and the burden on Defendants only requires them to respect the First Amendment's right to freedom of speech and religious expression.

95.     It is in the public interest to restrain Defendants from continuing a practice that violates the First Amendment.

96.     Mr. Cole seeks to have Defendants permanently enjoined from having or creating a policy that engages in viewpoint discrimination and fails to have clear, content-neutral selection process with respect to the CCCC Student Art Exhibition.

WHEREFORE, Plaintiff prays that the Court:

1. Find that the Defendants have violated his rights under the First Amendment of the Constitution in violation of 42 U.S.C. § 1983;

2. Enter an award of actual and/or nominal damages in favor of Plaintiff;

3. Issue a permanent injunction barring Defendants from having a policy that engages in viewpoint discrimination and fails to have a clear, content-neutral selection process with respect to the CCCC Student Art Exhibition;

4. Provide for Plaintiff's attorneys' fees as allowed by law;

5. Tax the cost of this action against Defendants; and

6.  Award such other relief as the Court deems just and proper.

Respectfully submitted this 7th day of May, 2021.

**BROOKS, PIERCE, McLENDON,**
**HUMPHREY & LEONARD, L.L.P.**

/s/ Daniel L. Colston
Eric M. David
N.C. State Bar No. 38118
edavid@brookspierce.com
Ryan Fairchild
N.C. State Bar No. 47729
rfairchild@brookspierce.com
Daniel L. Colston
N.C. State Bar No. 52083
dcolston@brookspierce.com
1700 Wells Fargo Plaza
150 Fayetteville St. (27601)
Post Office Box 1800
Raleigh, NC 27602
Telephone:   919-839-0300
Facsimile:   919-839-0304
*Attorneys for Plaintiff*